ASKREN HUB STATES PEST
CONTROL SERVICES, INC.,
Appellant–Plaintiff,

v.

ZURICH INSURANCE COMPANY and
Zurich American Insurance Group,
Appellee–Defendant.

No. 49A02–9902–CV–133.

Court of Appeals of Indiana.

Dec. 21, 1999.

C. Dennis Wegner, Jeffrey K. Orr, C. Dennis Wegner & Assoc., P.C., Indianapolis, Indiana, Attorneys for Appellant.

Robert A. Anderson, Richard A. Smikle, Ice, Miller, Donadio & Ryan, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

ROBB, Judge

Askren Hub States Pest Control Services ("Askren") appeals the trial court's grant of summary judgment in favor of Zurich Insurance Company and Zurich American Insurance Group (collectively "Zurich") in a breach of contract action. We affirm.

### Issue

Askren raises a single issue for our review, which we restate as: whether the trial court properly granted Zurich's motion for summary judgment.

### Facts and Procedural History

The undisputed facts and the facts most favorable to the non-movant reveal that Zurich issued a commercial general liability policy (the "CGL policy") to Askren, which was effective for one year commencing on August 14, 1993. Zurich renewed the policy for an additional year on August 14, 1994. The annual premium for the renewal policy was $8,319.00. The CGL policy contained several endorsements, including a pest control damage liability coverage form (the "pest control form") and a commercial general liability coverage form (the "CGL coverage form").

On April 14, 1994, an individual employed by Askren as a pesticide applicator performed a termite inspection on a private residence located in Tilden, Indiana. At the time of the inspection, Charles Hurst was in the process of purchasing the home that Askren was inspecting for termites. After inspecting the home, the Askren employee prepared a written report which concluded that there was no visible evidence of infestation from wood-destroying insects, such as termites, in the home. Relying on Askren's report, Hurst later purchased the home. On May 23, 1994,

Hurst's realtor notified Askren via telephone that Hurst and another pest control company had found termites in the home. Askren did not notify Zurich of this telephone call from Hurst's realtor.

On May 31, 1994, the owner and president of Askren, Alan Askren ("Alan"), and the employee who performed the initial termite inspection of the residence visited Hurst at his home. During this visit, Alan found evidence of past termite damage and live termite infestation in Hurst's home. Alan also found evidence of damage to the home which appeared to have resulted from water rot. Askren did not notify Zurich of its discoveries at Hurst's home.

On August 11, 1994, Hurst's attorney sent Askren a letter requesting that the pest control company contact him regarding the termite infestation of Hurst's home. Askren did not forward this letter to Zurich. On August 31, 1994, Alan and Hurst spoke via the telephone and agreed to meet at Hurst's home on September 1, 1994. At that meeting, Alan promised Hurst that Askren would repair the visible termite damage and treat his home for termites. Askren did not notify Zurich of the meeting nor of the remedial measures that Askren promised to undertake at Hurst's home.

In late September or early October, Askren treated Hurst's home for termites and repaired or replaced portions of residence containing visible evidence of termite damage without obtaining the consent of Zurich. Askren did not preserve the evidence of the termite damage to the Hurst home nor did it document the damages prior to making the repairs to the residence. Later, Askren refused Hurst's request that Askren repair the hidden termite damage to his home.

On November 8, 1994, Askren notified its insurance agent of Hurst's claim. However, Zurich denied coverage to Askren for Hurst's claim under the CGL policy on February 24, 1995. On July 6, 1995, Hurst filed a complaint against As-

kren in the Hendricks Circuit Court alleging negligence and breach of contract. On July 10, 1995, Askren's attorney sent Zurich a copy of the Hurst complaint and requested that Zurich assume Askren's defense in that litigation. On August 16, 1995, Zurich notified Askren that it would not assume the pest control company's defense of Hurst's lawsuit.

Subsequently, Askren retained counsel to defend it against Hurst's lawsuit. On August 23, 1996, the Hendricks Circuit Court entered judgment in favor of Hurst and against Askren in the amount of $40,000.00 plus costs. On October 1, 1996, Askren requested Zurich to either pay the full amount of the judgment entered against it in the Hendricks Circuit Court or assume the cost of the appeal to this court. Zurich refused both of Askren's requests. Consequently, Askren filed a lawsuit in the Marion Superior Court against Zurich for breach of contract. Thereafter, Zurich moved for summary judgment which was later granted by the trial court. This appeal ensued.

### Discussion and Decision
### I. Standard of Review for Summary Judgment

The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law. *Bastin v. First Indiana Bank*, 694 N.E.2d 740, 743 (Ind.Ct.App.1998), *trans. denied.* When reviewing a grant or denial of summary judgment, this court applies the same standard as does a trial court. *USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 537 (Ind.1997). Summary judgment should be granted only if the designated evidentiary material shows that there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. Ind. Trial Rule 56(C); *Hoskins v. Sharp*, 629 N.E.2d 1271, 1276 (Ind.Ct.App.1994). On review, we may not search the entire record to support the judgment, but may only consider that evidence which had been specifically designated to the trial court. *North Snow Bay, Inc. v. Hamilton*, 657 N.E.2d 420, 422 (Ind.Ct.App.1995). The party appealing the denial of summary judgment has the burden of persuading this court on appeal that the trial court's ruling was erroneous. *See Warner Trucking, Inc. v. Carolina Cas. Ins. Co.*, 686 N.E.2d 102, 104 (Ind. 1997). We resolve any doubt about a fact or any inference to be drawn from it in favor of the nonmoving party. *Claxton v. Hutton*, 615 N.E.2d 471, 473 (Ind.Ct.App. 1993). Although the trial court made findings of fact and conclusions of law, it does not change the nature of our review of summary judgment. The entry of specific facts and conclusions in a summary judgment order aids our review by providing us with a statement of reasons for the trial court's decision, but it has no other effect. *P.M.S., Inc. v. Jakubowski*, 585 N.E.2d 1380, 1381 (Ind.Ct.App.1992).

### II. The CGL Policy

Askren contends that the CGL policy issued by Zurich to Askren covers property damage arising from Askren's negligent termite inspection of a residence. We agree.

#### A. Coverage of the CGL Policy

Askren contends that the CGL policy clearly covers damages resulting from its negligent termite inspection of a residence. Specifically, Askren argues that the pest control form is part and parcel of the CGL policy, and that the pest control form clearly and unambiguously covers damages resulting from Askren's negligent termite inspection of a residence. In the alternative, Askren argues that even if the pest control form does not cover such damages, the CGL coverage form which is part and parcel of the CGL policy clearly and unambiguously covers damages resulting from Askren's negligent termite inspection of Hurst's home.

Zurich contends that neither the CGL coverage form nor the pest control form

covers the damages arising from Askren's negligent inspection of Hurst's home. Zurich also argues that it had no duty to defend or indemnify Askren under the CGL policy because Hurst's complaint against Askren is akin to a legal malpractice claim, and the CGL policy does not cover such professional malpractice.

■ Our initial inquiry is to determine whether the damage to the Hurst home occurred during the time period that Askren was insured by Zurich. Zurich issued a commercial general liability insurance policy to Askren, policy number GLO1457936–02F, which was effective from August 14, 1993 to August 14, 1994. R. 253. The insurance policy issued by Zurich to Askren was renewed by Askren under policy number GLO 1457936–03, which was effective from August 14, 1994 to August 14, 1995.[1] R. 16. Askren conducted the initial termite inspection of the Hurst home on April 14, 1994. R. 52. Thus, Askren was insured by Zurich under the CGL policy on April 14, 1994, the date that Askren conducted the negligent termite inspection of Hurst's home.

■ Because we have determined that Askren was insured by Zurich on the date that it negligently conducted the termite inspection of Hurst's home, we must now determine whether the insurance policy issued by Zurich to Askren covers damages resulting from Askren's negligent termite inspection of a residence. Under Indiana law, a contract for insurance is subject to the same rules of interpretation as are other contracts. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985). The interpretation is "primarily a question of law for the court, even if the policy contains an ambiguity needing resolution." *Tate v. Secura Ins.*, 587 N.E.2d

665, 668 (Ind.1992). If the language in the insurance policy is clear and unambiguous, then it should be given its plain and ordinary meaning. *Id.* An unambiguous insurance policy must be enforced according to its terms, even those terms that limit an insurer's liability. *Selleck v. Westfield Ins. Co.*, 617 N.E.2d 968, 970 (Ind.Ct.App. 1993), *trans. denied.*

■ However, if the language of the policy is ambiguous, then the court may apply the rules of construction in interpreting the language. *Eli Lilly*, 482 N.E.2d at 470. An ambiguity does not arise merely because the two parties proffer differing interpretations of the policy language. *Lexington Ins. v. American Healthcare Providers*, 621 N.E.2d 332, 336 (Ind.Ct.App.1993), *trans. denied.* Rather, the policy is ambiguous only if it is "susceptible to more then one interpretation and reasonably intelligent persons would differ as to its meaning." *Commercial Union Ins. v. Moore*, 663 N.E.2d 179, 181 (Ind.Ct.App.1996), *trans. denied. See Masonic Accident Ins. Co. v. Jackson*, 200 Ind. 472, 481, 164 N.E. 628, 631 (1929). If there is an ambiguity, an insurance contract should be interpreted in the light most favorable to the insured. *Eli Lilly*, 482 N.E.2d at 470. The contract should be construed to further its basic purpose of indemnity.

■ The schedule of the CGL policy issued by Zurich to Askren provides that the pest control form is part and parcel of the CGL policy. R. 41. Thus, both Zurich and Askren are bound by the provisions and terms contained in the pest control policy. We believe that the terms of the

1. We note that the record does not contain the initial CGL policy, policy number GLO 1457936–02F, which was issued by Zurich to Askren. The record contains only the renewal CGL policy, policy number GLO 1457936–03. R. 16. Askren conducted the negligent termite inspection of Hurst's home on April 14, 1994, and thus, Hurst's claim arose under the

the initial policy. Because neither party has alleged otherwise, we will assume that the initial CGL policy and the renewal CGL policy contained identical provisions. To the extent there are differences between the initial and renewal policies, both parties have waived our review of the initial policy issued by Zurich to Askren.

pest control form[2] are clear and unambiguous, and express both Zurich and Askren's intent that the damages arising from Askren's negligent termite inspection of a residence is covered by the pest control form of the CGL policy.

The pest control form of the CGL policy under the title "COVERAGE P. PEST CONTROL PROPERTY DAMAGE LIABILITY," provides in pertinent part that:

1. Insuring Agreements

A. In consideration of the premium indicated in the Schedule, we will pay on behalf of the insured those sums that the insured becomes legally obligated to pay because of "property damage" which arises from a "pest inspection."

. . .

(2) Inspections must be made by [sic] the insured during our policy period[3] within the "coverage territory,"[4] and during the conduct of the insured's business as a "pest" control contractor.[5]

(3) The "property damage" must be caused by an "occurrence."

R. 37. The pest control form of the CGL policy defines "property damage" as:

Any "pest" damage, which was not indicated on the inspection report, but should have been discovered by the insured through a routine inspection, necessitating repair or replacement of damage to real property, and where live active "pest" infestation is found.

R. 40. Furthermore, an "occurrence" is defined in the pest control form of the CGL policy as:

An active "pest" infestation of property, including continuous or repeated exposure to substantially the same general harmful conditions, which happen after inspection of the insured.

*Id.*

■ The damages to Hurst's home must fit within the definition of "property damage" in the pest control form in order for the CGL policy to cover the loss. On April 14, 1994, Askren conducted the termite inspection at the residence Hurst later purchased. The Askren employee who conducted the termite inspection of Hurst's home prepared a termite inspection report, stating that "no evidence of infestation from wood destroying insects was obvious." *Id.* Hurst relied on Askren's termite inspection report when he purchased the residence for $52,500.00. After purchasing the home, Hurst discovered that the residence was infested with termites, and that the home had sustained damage from the pests. Therefore, the Hurst home suffered "property damage"

**2.** We will not address Askren's argument that the CGL coverage form also covers damages arising from the negligent termite inspection of a residence. The language of the CGL coverage form is broad and does not specifically refer to damages arising from a pest inspection. The CGL coverage form provides in pertinent part that "we will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which the insurance applies." R. 23. In contrast, the pest control form specifically refers to damage "which arises from a pest inspection." R. 37. When a contract contains general and specific provisions relating to the same subject, the specific provision controls. *George S. May Int'l Co. v. King*, 629 N.E.2d 257, 261 (Ind.Ct.App. 1994), *trans. denied.*

**3.** Askren conducted the termite inspection of Hurst's home on April 14, 1994, which was

during the policy period of the CGL policy issued by Zurich to Askren. R. 52.

**4.** The pest control form defines "coverage territory" as "the United States of America (including its territories and possessions), Puerto Rico and Canada." R. 40. Because Hurst's home is located in Tilden, Indiana, Askren conducted the termite inspection within the "coverage territory." R. 52.

**5.** Kevin Grissom, an individual employed by Askren as a pesticide applicator, conducted the termite inspection of Hurst's home on April 14, 1994. R. 52. Grissom was acting in his capacity as a pesticide applicator when he visited Hurst's home on April 14, 1994 and conducted the termite inspection at the residence. *Id.*

as a result of Askren's failure to detect the termite infestation of the residence as defined by the pest control form of the CGL policy.

■■■ The pest control form of the CGL policy also requires that the "property damage" be caused by an "occurrence." Askren conducted the termite inspection of Hurst's home on April 14, 1994. On May 23 or 24, 1994, Hurst's realtor contacted Askren via telephone to report that Hurst had discovered termites in the home. On May 31, 1994, Alan and an Askren employee visited Hurst's home and discovered that the residence was infested with termites and that the home had suffered damage as a result of the infestation. The time period between Askren's termite inspection of the residence for termites and the discovery of the infestation of the residence by Hurst was less than two months, and thus, it is reasonable to assume that the residence was infested with termites on April 14, 1994. Additionally, Askren admitted in Hurst's suit against Askren that it "was negligent in failing to report evidence of live termites and termite damage." Brief of Appellant at 20. Moreover, Hurst's home was repeatedly exposed to an active pest infestation after the home was inspected by Askren. Therefore, we believe that the "property damage" was a result of an "occurrence" as defined in the pest control form of the CGL policy, and thus, the CGL policy covered the loss from Askren's negligent inspection of Hurst's home. However, this does not result in automatic liability for Zurich because Askren has a duty to Zurich under the policy that must be fulfilled before coverage is extended to cover the loss.

### B. Condition Precedent To Insurance Coverage Under the CGL Policy

Askren also contends that the trial court erred in granting Zurich's motion for summary judgment because it fulfilled its duty under the pest control form of the CGL policy by providing Zurich with reasonable notice of the "occurrence." We disagree.

### 1. Reasonable Notice of an "Occurrence"

The CGL policy contained specific provisions regarding the insured's duty to promptly notify the insurance company after a loss. Notice provisions exist in both the CGL coverage form and the pest control form of the CGL policy. Because we have determined that the pest control form covers the damages resulting from Askren's negligent termite inspection of a residence, we must look to the notice provisions contained in the pest control form.[6] The pest control form of the CGL policy under the title "SECTION IV. CONDITIONS" provides in pertinent part that:

1. Duties In The Event Of "Occurrence," Claim or Suit

A. You must see to it that we are notified promptly of an "occurrence" which may result in a claim. Notice should include how, when, and where the "occurrence" took place;

B. If a claim is made or "suit" is brought against any insured, you must see to it that we receive prompt written notice of the claim or "suit."

C. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summons or legal papers received in connection with the claim or "suit."

R. 39.

■■■ We have held that the notice requirement is "material, and of the essence of the contract." *London Guarantee & Accident Co. v. Siwy*, 35 Ind.App. 340, 66 N.E. 481, 482 (1903). The duty to notify an insurance company of potential liability is a condition precedent to the company's liability to its insured. *Shelter Mut. Ins. Co. v. Barron*, 615 N.E.2d 503,

---

6. We note that the notice provisions of the CGL form are very similar to the notice provisions of the pest control form.

507 (Ind.Ct.App.1993), *trans. denied.* When the facts of the case are not in dispute, what constitutes reasonable notice is a question of law for the court to decide. *Id.* Unlike other policy provisions requiring the cooperation of the insured, noncompliance with notice of claim provisions resulting in an unreasonable delay triggers a presumption of prejudice to the insurer's ability to prepare an adequate defense. *Miller v. Dilts,* 463 N.E.2d 257, 265 (Ind. 1984). The Indiana Supreme Court stated in *Miller* that:

> The requirement of prompt notice gives the insurer an opportunity to make a timely and adequate investigation of all the circumstances surrounding the accident or loss. This adequate investigation is often frustrated by a delayed notice. Prejudice to the insurance company's ability to prepare an adequate defense can therefore be presumed by an unreasonable delay in notifying the company about the accident or about the filing of the lawsuit. This is not in conflict with the public policy theory that the court should seek to protect the innocent third parties from attempts by insurance companies to deny liability for some insignificant failure to notify.

*Id.*

■ We believe that the notice provision contained in the pest control form of the CGL policy is clear and unambiguous, and thus, the insured's duty to "promptly notify" the insurance company of an "occurrence" is a condition precedent to Zurich providing coverage under the CGL policy for damages arising from Askren's negligent termite inspection of a residence. Because the notice provision is a condition precedent to obtaining coverage under the CGL policy, we must determine whether Askren satisfied its duty to "promptly notify" the insurance company of the problem with the termite inspection of Hurst's home.

■ The specific language of the pest control form states that "you must see to it that we are promptly notified of an 'occurrence' which may result in a claim." R. 39. This condition that the insurance company must be "promptly notified" means notice within a reasonable time.[7] Therefore, we must look to the undisputed facts of the present case to determine if Askren informed Zurich of the "occurrence" within a reasonable time.

■ Askren conducted the initial termite inspection of Hurst's home on April 14, 1994, and reported that the home was not infested with termites. On May 23 or 24, 1994, Hurst's realtor notified Askren that Hurst's home was infested with termites. On May 31, 1994, Askren confirmed that Hurst's home was infested with termites when Alan and an employee of Askren conducted another inspection of the residence and discovered the home infested with the pests. However, Askren did not notify the insurance company of the "occurrence" until November 8, 1994, when it notified it's insurance agent about the problem with the inspection at Hurst's home. We believe that Askren's delay of six months before notifying Zurich of the "occurrence," constitutes unreasonable notice. *See Miller,* 463 N.E.2d at 266 (court ordered summary judgment to be entered in favor of the three insurance companies which received notice of the accidents giving rise to liability one month, six months, and seven months after their occurrence and which received notice of the resulting lawsuits as early as five days after the suits were filed). *See also Sutton v. Littlepage,* 669 N.E.2d 1019, 1023 (Ind.Ct.App.

---

7. Indiana courts have construed the following phrases to require "reasonable notice": (1) "promptly notify," *Miller,* 463 N.E.2d at 263; (2) "notice as soon as possible," *Erie Ins. Exch. v. Stephenson,* 674 N.E.2d 607, 611 (Ind.Ct.App.1996); *Shelter Mut. Ins. Co. v. Barron,* 615 N.E.2d 503, 506 (Ind.Ct.App.

1993), *trans. denied;* (3) "notice as soon as practicable," *Hartford Accident & Indem. Co. Hartford, Conn. v. Armstrong,* 125 Ind.App. 606, 613, 127 N.E.2d 347, 350 (1955); (4) "immediate notice," *Employers' Liability Corp. v. Light, Heat & Power Co.,* 28 Ind.App. 437, 63 N.E. 54, 56 (1902).

1996) (two year delay in notification raised presumption of prejudice); *Erie*, 674 N.E.2d at 611 (insured's four year delay between accident and notification to the insurance company was unreasonable as a matter of law); *Allstate Ins. Co. v. Kepchar*, 592 N.E.2d 694, 698 (Ind.Ct.App. 1992), *trans. denied* (notification of insurance company one year after entry of final judgment resulted in prejudice was unreasonable). Because we have determined that Askren failed to give Zurich reasonable notice of the "occurrence," we must now determine whether Zurich was prejudiced by the unreasonable delay.[8]

### 2. Prejudice

 Our inquiry does not end with a determination that Askren gave Zurich unreasonable notice of the "occurrence." Even if Askren did not give Zurich reasonable notice of the "occurrence," that failure will not bar recovery under the CGL policy unless Zurich suffers prejudice as a result of the delay. *See Miller*, 463 N.E.2d at 265–66; *see also Shelter*, 615 N.E.2d at 507. Although Zurich must show actual prejudice from Askren's unreasonable delay in providing notice about the "occurrence," prejudice to Zurich's ability to prepare an adequate defense can be presumed where, as here, there is an unreasonable delay in notification. *See Miller*, 463

N.E.2d at 265. The presumption of prejudice essentially means that if the delay in giving the required notice is unreasonable, the injured party or the insured has the burden to produce evidence that prejudice did not actually occur in the particular situation. *See id.* Therefore, in the present case, it was incumbent upon Askren to set forth "some evidence" to rebut the presumption that Zurich had suffered prejudice to its right to conduct a timely and adequate investigation. *See id.* The Indiana Supreme Court has stated that:

> Once such evidence is introduced, the question becomes one for the trier of fact to determine whether any prejudice actually existed. The insurance carrier in turn can present evidence in support of its claim of prejudice. Thus, both parties are able to put forth their respective positions in the legal arena.

*Id.* at 265–66.

Askren offered the affidavit[9] of Alan to show that Zurich was not prejudiced by Askren's delay in notifying Zurich of the "occurrence." R. 327. Askren referred the trial court to portions of Alan's affidavit which provided that: (1) Askren had possession of photographs[10] depicting the termite damage to Hurst's home; (2) Zurich did not contact him or any other employee of Askren about the "occur-

---

**8.** We need not address Zurich's argument that Askren voluntarily assumed an obligation without obtaining Zurich's consent, and thus, Zurich had the right to deny coverage to Askren under the CGL policy. However, we note that the pest control form of the CGL policy provides in pertinent part that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." R. 39. On September 1, 1994, Alan met Hurst at his home and promised to repair the termite damage to the residence and treat it for termites. R. 178–79. Askren later completed the repairs and treatment of Hurst's residence. Askren did not notify nor obtain Zurich's approval prior to completing the remedial measures at Hurst's home. R. 212. Because Askren did not gain Zurich's consent prior to voluntarily "assuming the obligation" of repairing the termite damage at

Hurst's home and treating it for termites, we believe that Zurich also had a right to deny coverage to Askren under this provision of the CGL policy.

**9.** We note that Trial Rule 56(E) provides in pertinent part that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein...."

**10.** Askren did not introduce into evidence the photographs taken by Hurst depicting the termite damage to his home. R. 334. Askren only took its own photographs of Hurst's home after it had attempted to repair the termite damage at the residence and treat it for termites. R. 196.

rence"; and (3) Zurich did not request that Askren produce any evidence pertaining to the "occurrence nor did it interview any employees from Askren." R. 327–28, 250–51.

We hold that Askren did not provide sufficient evidence to rebut the presumption of prejudice as a matter of law. Askren's six month delay in notifying Zurich of the "occurrence" prejudiced Zurich in conducting an adequate investigation. Even assuming arguendo that Askren had presented to the trial court sufficient evidence to rebut the presumption of prejudice and shifted the burden to Zurich, we believe that Zurich presented sufficient evidence to the trial court to support its claim of prejudice. The pest control form of the CGL policy under the title "2. EXCLUSIONS" provides in pertinent part that "[t]his insurance does not apply to: ... C. Existing 'property damage' at the time of inspection." R. 38. Thus, the CGL policy only provides liability coverage for termite damage which occurred after Askren inspected Hurst's home for termites, and not for termite damage that existed prior to Askren's inspection of the residence.

On April 14, 1994, Askren conducted the initial termite inspection of the residence that Hurst later purchased. Askren's report stated that the home contained no visible evidence of termites. Askren later learned that its report was erroneous and that Hurst's home was infested with termites. Consequently, in late September or early October, Askren repaired and replaced portions of Hurst's home that appeared to have been damaged by termites without notifying or obtaining the consent of Zurich.[11] However, Askren did not preserve any of the portions of the home that it replaced, nor did it photograph the damaged portions of the home prior to making repairs. Moreover, Askren treated Hurst's home for termites which eliminat-

ed the pests from the residence. Askren eventually notified Zurich of the "occurrence" on November 8, 1994, after Askren had destroyed the evidence that was needed to conduct an adequate investigation. Askren's repair work and destruction of the evidence made it impossible for Zurich to determine which damage resulted from Askren's negligent termite inspection of Hurst's home. This is especially true because Askren admitted that Hurst's home showed damage resulting from water rot, and not termites, and that Hurst's home contained evidence of past termite infestation. Therefore, Zurich was prejudiced by Askren's unreasonable delay in notifying it of the "occurrence."

### Conclusion

Based on the foregoing, we hold that the trial court did not err in granting Zurich's motion for summary judgment

Affirmed.

FRIEDLANDER, J., and RILEY, J., concur.

---

11. Askren repaired or replaced portions of the home containing visible evidence of termite damage, including: (1) drywall in the bathroom, kitchen, and bedroom; (2) trim on the exterior siding; (3) window sill; (4) wall trim; (5) door jamb and trim; (6) wall stud; and (7) bedroom baseboard. R. 186–87, 189–98, 204, 235–36. Askren did not preserve the wall trim, bedroom baseboard, and siding that Askren replaced. R. 191–92, 195.